### SPERRY and others *v.* SPRINGFIELD F. & M. INS. Co.

*(Circuit Court, D. Colorado. January 29, 1886.)*

**1. FIRE INSURANCE — POLICY — KEEPING NITRO-GLYCERINE ON PREMISES — DYNAMITE OR GIANT POWDER.**
    The keeping of dynamite or giant powder in a building, without the written consent of the insurance company, will avoid a policy prohibiting the keeping of nitro-glycerine in the building insured.

**2. SAME — WAIVER OF PROVISION — PAROL AGREEMENT.**
    Such a provision in a policy cannot be waived, or in any way affected, by a parol understanding at the time of the application for the policy, even if it is explicit and direct.

**3. SAME — CUSTOM AND USAGE.**
    Such a policy cannot be affected by proof of custom or usage as to the keeping of dynamite or giant powder.

At Law.

*Wells, Macon & McNeal*, for plaintiffs.

*Markham & Dillon*, for defendant.

HALLETT, J., *(orally.)* Edward A. Sperry and others, partners under the name of "Sperry Bro. & Co.," doing business at Garfield, in this state, brought suit against the Springfield Fire & Marine Insurance Company on a policy issued to them on the twenty-third day of November, 1882, for the sum of $1,000. The loss occurred in the month of October, 1883, within the life of the policy. The policy, as

originally issued, described only a building used as a store by plaintiffs in the town of Garfield.   On the twenty-sixth of March, 1883, the policy was extended so as to cover stock in an adjoining building used by plaintiffs as a' warehouse.   The agreement in respect to that matter is set up in the answer, and is as follows:

"The portion of the within stock having been moved into the one-story frame building connecting with the original location, this policy is made to cover said stock now in the two buildings connecting."

That is all of the subsequent agreement relating to the stock in the warehouse, so that after this extension of the policy the covenants and agreements, and all the provisions of the policy, must be taken to relate to the warehouse, as well as to the building in which the store was kept, and which alone was specified in the policy as originally drawn.   This policy contained a clause, quite usual in such instruments, avoiding the policy if certain things should be done by the insured.   Among other things this was specified:

"If the assured shall keep gunpowder, fire-works, nitro-glycerine, phosphorous, saltpeter, nitrate of soda, petroleum, or any of its products,—naphtha, gasoline, benzine, benzole, or benzine varnish,—or keep or use camphene, spirit gas, or any burning fluid, chemical oils, without written permission in this policy, then, and in every such case, this policy is void."

The question arises upon the clause so far as it relates to nitro-glycerine.   It is fully established in the evidence that there was a large quantity of what is called dynamite or giant powder in the warehouse attached to the main building, and which was brought within the terms of the policy by this agreement of March 26, 1883. If dynamite or giant powder is to be regarded as nitro-glycerine, then the keeping of it was forbidden by this provision of the policy.   I understand the position of the plaintiffs to be that it cannot be so regarded; that it is a distinct and separate article from nitro-glycerine, and the policy cannot be avoided unless it was expressly named in the policy as dynamite or giant powder.   It appears in evidence, also, and it sufficiently appears also from the definitions given of dynamite, that the effective agent in that compound is nitro-glycerine.   I have not found giant powder mentioned in any of the dictionaries or works to which I have been able to refer on that subject.   In the edition of 1860 of the American Encyclopedia neither nitro-glycerine nor dynamite are mentioned.   In the last edition of the Encyclopedia Britannica dynamite and nitro-glycerine are each mentioned, and something of the history of them is given.   *First*, as to nitro-glycerine.   It is said here that it was discovered by Sobrero in 1846.   Then the elements of it are given, and how it is made, and some description of it:

"The first attempts to utilize the explosive power of nitro-glycerine were made by Nobel in 1863.   They were only partially successful, until the plan, first applied by General Pictot in 1854, of developing the force of gunpowder in the most rapid manner, and to the maximum extent, through the agency of an initiative detonation, was applied by Nobel to the explosion of nitro-glyc-

erine. Even then, however, the liquid nature of the substance, though advantageous in one or two directions, constituted a serious obstacle to its safe transport and storage, and to its efficient employment. It was therefore not until Nobel hit upon the expedient of producing plastic solid preparations, by mixing a liquid with solid substances in a fine state of division, capable of absorbing and retaining considerable quantities of it, that the future of nitro-glycerine as one of the most effective and convenient blasting agents was secured. Charcoal was the first absorbent used; eventually the silicious (infusorial) earth known as 'kieselghur' was selected by Nobel as the best material for producing dynamite, (which see,) as it absorbs, after calcination, from three to four times its weight of nitro-glycerine, and does not part with it easily when the mixture is submitted to pressure or frequent alterations of temperature."

Then, in the conclusion of the article, he says:

"The most recent and most perfect form in which nitro-glycerine is now used is called 'blasting gelatine.' This material, also invented by Nobel, is composed of the liquid and of a small proportion of so-called 'nitro-cotton,' which consists chiefly of those products of the action of nitric acid on cellulose which are intermediate between collodion-cotton and gun-cotton. * * * Blasting gelatine is rapidly replacing dynamite in some of its applications, and is already extensively manufactured in different countries."

At the head of this article, the synonyms of nitro-glycerine are "glonoise, glonoise oil, dynamites, blasting gelatine."

In the article entitled "Dynamite" there is some reference to the substances used for compounding them. In this article it is stated that the first application of it was made by Nobel in 1863, who used gunpowder soaked with it for blasting. Then the use of kieselghur is referred to, and further on it is said that "another defect is its liability to part with a portion of its nitro-glycerine especially when in contact with porous substances, such as the paper of cartridges and wrappers; that for the manufacture of dynamite the best absorbents are kaolin, tripoli, alumina, and sugar. The last, like alum, the material employed in Mr. Horsley's preparation, has the advantage of being separable from associated nitro-glycerine by solution in water. Dynamite, as made by M. P. Champion, consisted of 20 to 25 parts of nitro-glycerine with 75 to 80 parts of finely pulverized burnt clay, from glass-works; and, in some explosives sold as dynamite, a mixture of saw-dust and chalk is substituted for silicious substances."

From what is stated here, it is apparent that almost anything which will take up the nitro-glycerine, and hold it until it may be needed for use, in the proportion of one-fourth or one-fifth of the whole quantity, will make an explosive of this kind, and it is quite natural that each manufacturer or each person who may discover a new agent for conveying it should give it a new name, as in this article on "Nitro-glycerine," in this volume of the Encyclopedia Britannica, names are given which are not in use at all in this country. I have looked in the last edition of Webster's Dictionary, and "glonoin," "glonoin oil," and "blasting gelatine" are not referred to at all; and yet, in this article, it is said that blasting gelatine is regarded as the

best form in which it can be used, and the names which are in common use in this country, as giant powder, Atlas powder, and Hercules powder, and the like, are not found in the last edition of the dictionary. All of these substances are of such recent discovery and use that it has only been within a few years that they have come into the books at all. "Dynamite" is not defined in the edition of Worcester's Dictionary of 1870, and "nitro-glycerine" is not in any of the dictionaries to this day. It is only in scientific works and in encyclopedias. That is certainly the first word that was adopted to describe this agent as derived from nitric acid and glycerine, and it seems to me to be perfectly clear that, whatever new names may now be given to the various compounds in which nitro-glycerine is the active and effective force, that they are all well enough described in a policy of insurance by the term "nitro-glycerine."

It is pretty certain that some of these names which are now in use were not known at the time this policy was issued, only two or three years ago. Dynamite was then known, and perhaps was in more general use to describe this substance than nitro-glycerine; but, as nitro-glycerine is the base and the force which is used in this explosive, I think that it must be said that any of these compounds are meant by the use of that name in a policy of insurance; so that the keeping of this giant powder or dynamite, or by whatever name it may be known, in this store-house, was forbidden by this policy.

In that feature it differs from some other cases that were tried in this court, in which judgment was rendered for the plaintiffs, inasmuch as this policy covers the warehouse, and the other policies did not relate to a warehouse. It was thought in those cases that inasmuch as the companies had forbidden the keeping of nitro-glycerine in the store, and had not inserted any provision in the policy as to keeping it near the store, they could not complain of the circumstance that it was kept in a building adjoining the store; but if giant powder and dynamite, as described by the witnesses, are nitro-glycerine, it is directly forbidden by the terms of this policy, and the policy declares that the keeping of such an article will make it void. That is the result, unless there was some permission given at the time of the issuance of the policy which would come within the terms of the clause which I have read. As to that, it is to be observed that the policy provides that these articles are not to be kept without written permission in the policy. It is said that a Mr. Pomeroy, who examined the premises with a view to other policies on the same stock, some time prior to the date of this policy, was notified that dynamite was kept in the store, and that he expressly consented that it should be kept there. There is some question whether he was then acting as the agent, even of the other companies who issued policies at that time, and whether this company can be affected by what he said at that time in respect to keeping dynamite. If, however, this policy is not to be affected by any parol agreement made at the time of the

application for any policy, it is immaterial and not necessary to consider whether he made such an agreement or not. In my judgment, a provision of this kind in the policy cannot be waived or in any manner affected by a parol understanding at the time of the application for the policy, even if it is explicit and direct. In terms, the policy provides that these things shall not be kept without written permission in the policy. On that subject there is a case in 15 Wall. 664, (*Insurance Co.* v. *Lyman.*) The point decided is not exactly that which arises in the case at bar, but the remarks of Mr. Justice MILLER are to the point:

"Undoubtedly a valid verbal contract for insurance may be made, and where it is relied on, and is unembarrassed by any written contract for the same insurance, it can be proved and become the foundation of a valid recovery as in all other cases where contracts may be made either by parol or in writing. But it is also true that where there is a written contract of insurance it must have the same effect, as the adopted mode of expressing what the contract is, that it has in other classes of contract, and must have the same effect in excluding parol testimony in its application to it that other written instruments have."

And further on, in the same opinion:

"We think it equally clear that the terms of the contract having been reduced to writing, signed by one party, and accepted by the other at the time the premium of insurance was paid, neither party can abandon that instrument as of no value in ascertaining what the contract was, and resort to the verbal negotiations which were preliminary to its execution for that purpose. The doctrine is too well settled that all previous negotiations and verbal statements are merged and excluded when the parties assent to a written instrument as expressing the agreement."

I understand that to be the rule in this class of cases as well as in others. Whatever took place between Mr. Pomeroy and these plaintiffs at the time the negotiations for this policy took place, assuming that he was agent of the company at that time, or at the time of the negotiation for any other policy, is not to be shown in opposition to the express language of the policy.

There was evidence also tending to prove that giant powder and such explosives were kept in stores of this kind in the mining districts, and a custom of that kind was relied on as relieving the plaintiffs from the provisions of the policy. In respect to any such custom, if it prevailed, that also was subject to the rule which obtains in respect to any parol agreement which may have been made affecting the terms of the policy.

In *Grace* v. *American Cent. Ins. Co.*, 109 U. S. 278, S. C. 3 Sup. Ct. Rep. 207, it is said that "an express written contract embodying in clear and positive terms the intention of the parties cannot be varied by evidence of usage or custom." In *Barnard* v. *Kellogg*, 10 Wall. 383, this court quotes with approval the language of Lord LYNDHURST, in *Blackett* v. *Royal Exchange Assur. Co.*, 2 Cromp. & J. 244, that "usage may be admissible to explain what is doubtful; it is never admissible to contradict what is plain." This rule is based

upon the theory that the parties, if aware of any usage or custom relating to the subject-matter of their negotiations, have so expressed their intention as to take the contract out of the operation of any rules established by mere usage or custom.

Of course, if the plaintiffs were forbidden to keep this article by the terms of the policy, they cannot bring in a custom or usage as avoiding that prohibition of the policy. If there is any such custom, it cannot prevail against the express language of the policy; and if there was such a custom it could not relate to the quantity which was shown to have been kept on the premises. It was testified by the clerk that there was 400 pounds. Mr. Fulton testified that Mr. Sperry stated that there was 700 pounds. Mr. Sperry, when his attention was called to it, conceded that he had said something about dynamite, but did not admit that he had said it would avoid the policy; but he said nothing as to the quantity, apparently admitting that there may have been 700 pounds. The keeping of such a quantity of so dangerous a substance in such a place as that was a remarkable act of carelessness. It was dangerous to the whole community to have such stuff as that, in such quantity, in a store where people are passing and repassing, and going in and out of the store to trade.

I think plaintiffs are not entitled to recover. The judgment will be for defendant.